573 So.2d 864 (1990)
Robert McLEOD, Individually and As Personal Representative of the Estate of Monzelle Kay McLeod, Appellant,
v.
CONTINENTAL INSURANCE COMPANY, Appellee.
No. 89-02586.
District Court of Appeal of Florida, Second District.
November 14, 1990.
Rehearing Denied January 2, 1991.
Hugh N. Smith and David S. Nelson of Smith & Fuller, P.A., Tampa, for appellant.
Michael M. Bell of Hannah, Marsee, Beik & Voght, Orlando, for appellee.
Gary Gerrard of Haddad, Josephs & Jack, Coral Gables, for the Academy of Florida Trial Lawyers, amicus curiae.
PATTERSON, Judge.
Robert McLeod brought a first-party bad faith action under section 624.155, Florida *865 Statutes (1985), against his insurance company, Continental, after Continental refused to settle McLeod's underinsured motorist claim. Finding that Continental acted in bad faith, the jury awarded McLeod $100,000 in damages. On appeal, McLeod argues that the trial court gave the jury incorrect instructions for measuring his damages. On cross-appeal, Continental claims that the jury instructions deprived it of its only defense. We address the cross-appeal first, hold that the instructions did deprive Continental of its defense, and reverse on that ground. As to McLeod's issue, we hold that the damages instructions were correct and certify the appropriate measure of damages to the supreme court as a question of great public importance.
The chain of events leading to this appeal began in July, 1985, when McLeod's automobile insurance policy with Iowa National was due to expire. McLeod bought a new policy from Continental and arranged for it to take effect one week before the Iowa National policy expired. During the week of overlapping coverage, McLeod's wife was killed in a collision with a CEN-COM truck.[1]
Originally, Continental did not expect to be called upon to pay benefits for this collision. CEN-COM's insurance appeared to be more than adequate; it had a $250,000 primary policy, and a $1,000,000 excess policy that, by coincidence, was with McLeod's old insurer, Iowa National. In addition to the $1,250,000 under CEN-COM's policies, McLeod's Iowa National policy provided $200,000 in underinsured motorist coverage.
Unfortunately, Iowa National became insolvent shortly after Mrs. McLeod's death. The Florida Insurance Guaranty Association (FIGA) assumed its responsibilities, and this automatically reduced CEN-COM's excess coverage to $300,000. Through no fault of its own, CEN-COM became underinsured.
After CEN-COM's coverage was reduced, McLeod offered to settle with all parties for $850,000. CEN-COM's primary carrier agreed to contribute its $250,000 limits, and FIGA agreed to pay $300,000 under CEN-COM's excess policy. However, FIGA was also responsible for McLeod's Iowa National policy, and it refused to pay that policy's $200,000 limits. Because Continental's policy provided coverage excess to McLeod's Iowa National policy,[2] FIGA's refusal to pay affected Continental's approach to the case.
Continental knew that under ordinary circumstances it would have a right to subrogation from CEN-COM for any benefits it paid under its policy. It also knew that under ordinary circumstances, voluntarily paying benefits under an excess policy before the primary policy's benefits were paid might cut off its right to seek subrogation. Continental apparently did not recognize that FIGA's involvement had already cut off its right to seek subrogation.[3] So, when FIGA refused to pay the benefits due under McLeod's primary policy, Continental also refused to pay the benefits due under its policy. As a result, the settlement negotiations failed.
McLeod then filed suit against CEN-COM for his wife's wrongful death. He settled with CEN-COM's primary carrier for its $250,000 limits, and with FIGA for $479,900. $300,000 of the FIGA settlement was attributed to CEN-COM's policy, but only $179,900 was attributed to McLeod's. Because McLeod accepted less than his $200,000 policy limits from FIGA, Continental again refused to settle.
The wrongful death action ultimately yielded a $1,250,000 verdict in McLeod's favor. McLeod then filed suit against Continental *866 for having, in bad faith, failed to settle the claim. Continental tendered its $300,000 policy limits to McLeod in payment of the wrongful death verdict, but denied liability for bad faith. It continued to maintain that as an excess carrier it had not been required to pay benefits until all other coverages were exhausted.
When the case went to trial, Continental attempted to show that its refusal to settle was reasonable under the circumstances. It introduced evidence showing that it was unaware of the statutory provisions by which FIGA's involvement cut off its right to subrogation. According to Continental, its attorneys did not advise it of these statutes and in fact warned it not to agree to the settlement.
McLeod, on the other hand, attempted to show that Continental should have known it had no right to subrogation. He introduced evidence showing that with FIGA's involvement, Continental knew the other coverages were not sufficient. He also showed that Continental made no effort to investigate or evaluate his claim, that its attorneys evaluated it at more than $1,000,000, and that they encouraged Continental to settle.
Thus, there was evidence from which the jury could have found that Continental acted reasonably; and there was evidence from which they could have concluded that it acted unreasonably. Under these circumstances, the trial court's instructions to the jury were critical.
McLeod requested, and over Continental's objection the trial court gave, a jury instruction derived from this court's opinion in Miller v. Safety Mutual Casualty Corp., 497 So.2d 1273 (Fla. 2d DCA 1986). The instruction said:
You are further instructed that under Florida law, it is no defense to a claim against an excess insurer that an insured accepted less than policy limits from underlying insurance carriers.
This interpretation of Miller is incorrect.
In Miller the insured's excess policy terms permitted her to make claims against the excess insurer before she exhausted the underlying coverages. We merely held the excess insurer to its terms. See 497 So.2d at 1274. Other policies, with other terms, might be interpreted differently. Thus, Miller did not establish as a rule of law the principle this instruction attributed to it.
Additionally, Miller was an action to recover benefits under a policy. It required the court to interpret the terms of the insurance contract. McLeod's action was for bad faith. It required a jury to determine whether Continental acted in good faith. Therefore, Miller did not apply; like people, insurance companies can be incorrect without acting in bad faith.[4]
The Miller instruction essentially told the jury that Continental acted in bad faith as a matter of law. Because this led almost inevitably to an award of damages in favor of McLeod, we reverse and remand for a new trial.
After receiving the Miller instruction, the jury determined that McLeod suffered $100,000 in damages and awarded him that amount. McLeod contends that this was inappropriate, and that the general damages instruction the trial court gave led the jury to return an insufficient verdict.[5] McLeod argues that the measure of damages for a first-party bad faith action should be identical to that for a third-party bad faith action: the difference between the underlying tort verdict and the benefits available under other policies (here, $200,000). He submitted a special damages instruction *867 to this effect, and challenges the trial court's refusal to give it.
We believe the trial court properly rejected McLeod's special damages instruction. Fundamental differences between third- and first-party bad faith actions render damages that are appropriate for one inappropriate for the other. Because of those differences the rationale underlying the measure of damages in a third-party bad faith action does not apply to such an action in a first-party setting.
Typically, in a third-party bad faith scenario, the insured party commits a tort, and the victim attempts to settle a claim against the tortfeasor for an amount within the limits of the tortfeasor's coverage. The tortfeasor's insurance company refuses to settle, and the victim wins a verdict which exceeds the tortfeasor's coverage. The tortfeasor is, of course, liable for the amount of the verdict which exceeds the coverage.
In such a situation, the tortfeasor's insurance company has complete control over the litigation. This control places an insurance company in a fiduciary relationship with its insured; and, if the company unreasonably fails to settle within the tortfeasor's policy limits, then it becomes liable for the excess. Because the insurance company's action created the excess liability, the excess amount is the appropriate measure of damages. See generally 15A Couch on Insurance 2d §§ 58:6, 58:11 (1983); Baxter v. Royal Indemnity Co., 285 So.2d 652 (Fla. 1st DCA 1973).
Baxter involved a first-party bad faith claim, but the terms "first-party" and "third-party" had not yet come into use and the first-party cause of action did not yet exist when the opinion issued.[6] Thus, the court concluded that the Baxter complaint failed to state a cause of action. However, in arriving at that conclusion the court analyzed the distinctions between these types of actions at some length.
In a first-party bad faith scenario, the insured party has been the victim of a tort and is claiming, under his own policy, benefits which the insurance company is refusing to pay. The insured must prove his entitlement to his policy's benefits through an action against the tortfeasor. In this situation, the insurance company has no fiduciary duty to its insured; rather, the relationship between the parties is adversarial. The verdict accrues to the insured; it does not expose the insured to liability. Baxter, 285 So.2d at 656. Thus, the insurance company's bad faith has not exposed its insured to excess liability, and the rationale for awarding the excess does not apply.
In the case of a first-party bad faith claim, the first element of damages is the value of the insured's claim, as determined by the underlying tort verdict, up to the insured's policy limits. The second element of damages is those damages proximately caused by the insurer's bad faith. These damages are consequential in nature and can include, but are not limited to, interest on the unpaid benefits, attorney fees, and costs of pursuing the action. They can be recovered even if the underlying tort verdict falls within the limits of the uninsured motorist coverage.
Thus, the insured obtains the full benefit of his insurance contract and is compensated for the egregious conduct of the insurer. In cases where the underlying tort verdict exceeds his uninsured motorist coverage, the insured is disadvantaged because he cannot collect the full value of his claim; however, that disadvantage results from the tortfeasor's insolvency and not from the chance occurrence of his insurance company's bad faith.
We believe that this is what the Florida legislature intended when it drafted the statutes which created the first-party bad faith cause of action. Section 624.155, Florida Statutes (1989), provides:
(1) Any person may bring a civil action against an insurer when such person is damaged:
.....

*868 (b) By the commission of any of the following acts by the insurer:
.....
1. Not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for his interests.
We find nothing in this statute which evinces an intent on the part of the legislature to require an insurer to pay for a "loss" it did not cause.
We note that in Jones v. Continental Insurance Co., 716 F. Supp. 1456 (S.D.Fla. 1989), the federal district court came to the opposite conclusion and held that Florida law requires applying the third-party bad faith measure of damages to first-party bad faith actions. In doing so, the district court relied in part upon the statute's legislative history, which states:
[Section 624.155] requires insurers to deal in good faith to settle claims. Current case law requires this standard in liability claims, but not in uninsured motorist coverage; the sanction is that the company is subject to a judgment in excess of policy limits. This section would apply to all insurance policies.
Jones, 716 F. Supp. at 1460 (quoting Staff Report, 1982 Insurance Code Sunset Revision (HB 4F; as amended HB 10G) (June 3, 1982)). This history does not conflict with our interpretation of the statute.
Rather, the history indicates that section 624.155 extends the requirement of dealing in good faith, which was already required of liability insurers, to all insurance policies. In saying "the sanction is that the company is subject to a judgment in excess of policy limits," it is merely stating that an uninsured motorist insurer may be liable in excess of its policy limits in cases where the insured's underlying tort claim exhausts his policy limits and the insurer becomes liable for additional consequential damages.
We therefore conclude that the trial court properly rejected McLeod's proposed special jury instruction on damages. However, because the resolution of the proper measure of damages will have a significant impact upon future first-party bad faith actions, we certify this question to the Florida Supreme Court as one of great public importance:
WHAT IS THE APPROPRIATE MEASURE OF DAMAGES IN A FIRST-PARTY ACTION FOR BAD FAITH FAILURE TO SETTLE AN UNINSURED MOTORIST INSURANCE CLAIM?
Reversed and remanded for new trial.
SCHEB, A.C.J., and CAMPBELL, J., concur.
NOTES
[1] CEN-COM, the corporate tortfeasor, is not involved in this litigation.
[2] Why the Continental policy is excess is unclear. From the record, it seems that Continental should have prorated its uninsured benefits with those available under McLeod's Iowa National policy. See Sellers v. U.S. Fidelity & Guar. Co., 185 So.2d 689 (Fla. 1966). However, the parties treated the policy as excess, and did not make that an issue on appeal.
[3] Section 631.54(3), Florida Statutes (1985), provides in part: "Member insurers shall have no right of subrogation against the insured of any insolvent member."
[4] 15A Couch on Insurance 2d § 58:1 (1983):

[T]he insurer should not be held liable for extra-contractual damages where there is a legitimate controversy as to whether benefits are due or the amount of such benefits... . [T]he insurer must be entitled to a full judicial resolution of controverted issues of fact and law without the imposition of penalties for the mere assertion of such a right.
(Citations omitted.)
[5] The trial court instructed the jury to determine "the total amount of damages which the greater weight of the evidence shows [McLeod] sustained as a result of any bad faith you find on the part of Continental Insurance Company."
[6] The Florida legislature created the first-party bad faith cause of action by statute in 1982, twelve years after Baxter. See § 624.155, Fla. Stat. (Supp. 1982).